Good morning. May it please the Court, I am Jack Alcaire. I represent Citizens for Mobility and the individual appellants in this case. I'd like to reserve two minutes for rebuttal, please. With the Court's indulgence, I might notice I was not intending to fly solo this morning. I have a number of co-counsel and clients intending to be here. I did not know this would start so early. They may trickle in. This is an appeal from a Federal District Court decision affirming a Federal Transit Administration or FTA decision refusing to write an SCIS or an EIS for the initial segment light rail project in Seattle and Tukwila, Washington. We ask this Court to reverse and remand for compliance with NEPA. We present two issues on appeal. One, the potential significant effects of initial segment not examined in the first EIS, and secondly, the absence of mandatory alternatives analysis. Regarding significant effects, the administrative record in this case states in part, and I quote, the introduction of light rail vehicles, and I might add introduction with buses, the introduction of light rail vehicles in the transit tunnel will significantly change the operation of the tunnel and require that fire life safety standards are met. Close quote. I cite from the record at 502688. Mr. Elkhart, I think that quotation actually kind of goes to the heart of what we have to figure out, and that is whether the operation is tantamount to an impact on the physical environment. Yes, Your Honor. It would help me if you would answer what I think is a legal question and then also clarify whether the impacts that you are complaining about or your clients are complaining about are essentially fire safety and life issues. Thank you, Your Honor. I'll do exactly that. If I might commence that response by stating that the NEPA regulation in question, which is in 40 CFR 1502.9C, states that an SEIS, quote, shall, close quote, be prepared if, quote, the agency makes substantial changes in the proposed action that are relevant to environmental concerns. Now, if I may, the administrative record says there will be a significant change in the operation. The regulation refers to substantial changes. I submit one can't slip a piece of paper or even a tissue between these two meanings, significant change and substantial change. They are substantially equivalent. Next step, are these significant changes relevant to environmental concerns within the meaning of the regulation? It seems clear the changes in question are relevant to fire life safety issues for the very discussion of significant changes is in the context of fire life safety issues. That is undisputed in the record. The record also makes it clear that safety issues are environmental concerns. I cite to the record at 502.529-30 and I cite to Sound Transit's appellate brief at pages 10 and 25. Let me ask you a question. Let's suppose the tunnel was only being used for light rail and that in the initial plans, and this is obviously a hypothetical question, there had been a requirement that the passenger seats in the light rail cars have seat belts. And as a cost-saving device, after all of the proper paperwork had been done, the Department of Transportation decided to eliminate the requirement for seat belts inside the car, inside the light rail cars. Would that require a NEPA statement? Would that require an NIS? I would doubt it, Your Honor. In this case — I would doubt that as well. What if it doubled the capacity of cars going through the tunnel? I think that would depend upon the analysis of the potential significant effect of that change. What is it about this change that is going from just use of the tunnel for light rail to using it for the dual purpose of light rail and bus that, in your judgment, has an impact on the environment to require this next step? Thank you, Your Honor. If I may, it's not in my judgment. I believe it's in the judgment of the agency that provided the administrative record and that the record reflects that. But they are going to spend at least $86 million rebuilding the tunnel. That is to say, reconfiguring the tunnel from the prior contemplated configuration for rail only. Those $86 million of changes include a brand new stub tunnel at the Pine Street exit, which involves new condemnation of property not contemplated in the original plan. It involves $50 million, essentially, of new right-of-way in that area that was not contemplated in the original plan. It contemplates changing the elevation of the track bed, different than the original plan, embedding the rails in the track bed, building a new electrical substation in or near the International District transit station, which, in the record, is described as, quote, fairly complicated construction, would be required, close quote, for this substation. But let me stop you there because that's, I think, you're talking now about what we might, at least in rough terms, consider a physical change to the environment or a potential physical change to the environment. Precisely, Your Honor. And that may have made sense to me that there might be a change in the environment. But as I read your brief, I didn't see all that, that that was really the basis for having a new EIS or supplemental EIS. I read your brief as really confined to these safety and fire issues. So tell me where I went wrong. You didn't go wrong. I think there are two independent points, but they're harmonious. But did you make that point? This physical change, is that what you appealed to the Ninth Circuit? No, Your Honor. And intriguingly, that issue never came up in the trial court. The first time that the FTA ever argued that there should be an affirmation of the agency action here because there was no, quote, physical change, close quote, to the environment was in its appellate brief here. So it was not until our reply brief that we addressed squarely this issue of the presence of physical change. I mean, it's sort of a double-edged sword. So let's say it's not a jurisdictional issue. Let's say, well, you can frame it two different ways. It's either jurisdictional, in which case we might look at it under a reasonable interpretation, or as merits, in which case we'd look at it under arbitrary and capricious. But either way, we've got to look at it, I think. So even if we they didn't raise it in terms of a jurisdictional issue initially, isn't that the heart and soul of the question as to whether you need another EIS? You need to still have something that's relevant to environmental concerns. And you have to have a significant environmental impact under all the regs, so whether they're jurisdictional or merits. Don't you still have the same issue? With respect, Your Honor, we do need something that's relevant to environmental concerns. The law of this circuit makes it crystal clear. We do not have to show a significant environmental effect. We have to show a potentially significant environmental effect. But again, if I could revert to the record, the record says there will be a significant change in the operations. There is no question that relates to fire life and safety. There is no question that safety concerns are environmental concerns and that safety impacts are environmental impacts. That's stated in the record. The original EIS environmental impact statement went into great detail talking about safety impacts. The EA, which we challenge here, went into detail talking about safety impacts. Maybe you can help me on the law because it is a little confusing. It seems to me that it's pretty clear when you do an initial EIS that you look at safety and other impacts that was low, but your requirement to do the initial EIS isn't predicated on safety issues. It's predicated on a pure environmental issue. My question is, once you've done that, the safety concerns are kind of collateral but integral to that initial EIS. Does that change when you go to a supplemental or a supplement EA? Well, any environmental impact which is potentially significant triggers an SEIS, whether it's a safety impact or any other kind of impact. With respect, it isn't collateral. The regulation, 40 CFR 1508.27b, explicitly references safety impacts as one of the environmental concerns to consider. What is the regulation again? Pardon me. 40 CFR 1508.27b. FTA has gone to great lengths here to convince this court to minimize safety impacts as collateral and to describe them as non-environmental impacts. They are just wrong. But if I may, I want to turn, if I can, to the alternatives analysis because in an important way, I think the court need not necessarily reach these sticky questions regarding significance or lack of significance because the FTA has violated NEPA's alternative requirements. They have violated this in two independent ways. They have not studied initial segment as an alternative in an SEIS or EIS. Their own regulation, 23 CFR 771.125a1, requires them to identify in an EIS the preferred alternative and evaluate all reasonable alternatives considered. It is undisputed that all of the alternatives examined in the original EIS were pure rail alternatives, mixed bus rail, which has never been done anywhere in the world before in tunnels with tunnel stations. It is unprecedented and untested, and it has not been evaluated in any EIS. The FTA has not followed its own regulation. It has not followed the law. Its rambling range of alternatives defense does not change this fact. Secondly, TSM baseline. I hope we don't get into too much transportation gobbledygook, but it is a baseline alternative that by regulation FTA must study, evaluate against rail for purposes of FTA funding. The district court complains here that the appellants, plaintiffs now appellants, have conflated requirements for FTA funding with NEPA requirements. We have not conflated those requirements. The Federal Government has. The Federal Government in NEPA regulation 40 CFR 1508.11 requires that NEPA procedures be infused into the ongoing programs and actions of Federal agencies. The Supreme Court in Weinberger cited in the briefs has made it clear that one of NEPA's essential aims is to inject environmental considerations into the Federal agency's decision-making process. I am not sure if there is any difference here in the meaning between injecting or infusing on the one hand or conflating on the other. But if we are confused of conflating, I suggest we are in awfully good company with the Supreme Court in Weinberger and with the express language of the NEPA regulation. You're down to under a minute. Thank you, Your Honor. There are no facts in dispute here. This is purely a legal question. FTA should have evaluated TSM baseline in the EIS. They did not do so. Because they have violated the alternatives requirements and because there are potentially significant environmental effects that have not been examined, we request this Court to reverse and remand for compliance with NEPA. Thank you. Thank you for your argument. We'll hear from the Secretary at this time. Mr. Kipnis. Good morning. Good morning. May it please the Court, my name is Brian Kipnis, Assistant United States Attorney representing the government. I'll be splitting my time with co-counsel for Sound Transit. Sound Transit applied to the Federal Transit Administration for federal funding to offset the construction cost of a minimally operable segment of its new light rail system, which when completed will serve Seattle and its surrounding communities. This application for federal funding triggered the FTA's responsibilities under NEPA to assess the environmental impacts of this project known as Central Link. The FTA did this in a final environmental impact statement, which was issued in 1999. The preferred alternative stretched for 21 miles and contemplated exclusive light-use rail of the DSTT. Subsequently, financial realities dictated that Sound Transit build Central Link in segments. Thus, Sound Transit developed its initial segment proposal, which contemplated the construction of a 14-mile first phase of Central Link. Of importance here, initial segment also contemplated mixed use of the DSTT by buses and light rail trains. None of the several alternatives in the 1999 EIS contemplated mixed use of the DSTT. Thus, Sound Transit and FTA began to work on a supplemental environmental assessment to determine whether the revised proposal resulted in environmental impacts of such significance or potential significance as to merit the preparation of an SEIS, a supplemental environmental impact statement. The FTA ultimately concluded that the changes to the original proposal did not result in any significant or potentially significant environmental impacts. Therefore, the FTA concluded that a supplemental EIS was not necessary. Here, CFM challenges the FTA's decision not to prepare an SEIS. Judicial review of the FTA decision is before the court under the arbitrary and capricious standard of review informed by a rule of reason with due deference to the substantial expertise of the FTA in such matters. I would submit, Your Honors, that the CFM argument here is the antithesis of a rule of reason applied in such matters. CFM first argues that there are unresolved questions of the safety associated with joint use of the DSTT by buses and light rail, which require the preparation of an SEIS as a matter of law. Their argument is flawed at every level of analysis. CFM is simply wrong in its belief that, by definition, safety considerations constitute environmental impacts. Safety considerations are not themselves environmental. Why don't we cut to the chase in terms of what their argument is. They're saying, look, you had one project. You changed it. And that change, which includes physical change, is going to have an outflow on fire safety and life. And why isn't that the same relationship between the physical environment and those issues that you have in the underlying EIS? Well, let's assume for the moment that there are physical changes. Well, the record says there are some physical changes. I counted up a bunch. Dr. Alkier named some other ones. I guess the kind of – this did come up in the argument. The physical changes that I think would be relevant would be, insofar as they relate to safety, is if there was a significant excavation and we were going to perhaps expose hazardous material that was buried, and then you had to deal with that in some way because there are safety concerns there. Safety itself is not a significant environmental impact. What it does is it informs the analysis of whether an environmental impact, a physical change in the environment, is itself significant. That's what the NEPA regulations say. If you're putting in a nuclear power plant, obviously safety is important. And in terms of assessing significance, safety is going to rise to the top in terms of compelling that an EIS be done. By the same token, a change in the physical environment that has no consequence of safety, there has to be a reason that that impact is significant. If there is a safety impact that is significant, then, of course, that may well compel an EIS. On the other hand – Wait a second. Let's say you had an electric generating plant and it was totally enclosed and you did all of your EIS on that. And then you said, you know what? I think we can do a little nuclear power inside this little capsule. I don't have to do anything outside my capsule. I'm not going to affect the outside environment at all. I'm just going to put inside my capsule, my tunnel, if you will. I'm now going to add a little nuclear power. Wouldn't that be the same thing as adding buses and rail at the same time to the tunnel? What would be the difference? Well, I guess I would think that introducing a nuclear power plant would be a change in the physical environment. Because it's worse than a bus? Well, I suppose, yes. How would we benchmark that? Well, the downtown Seattle Transit Tunnel now operates. It's operating with buses going through there all the time. So did the electric plant. Well, then we're introducing an electrical plant, something that is, I think, regarded as extremely hazardous. So let's say it started as a nuclear plant and then you added electric. You know, in that scenario, maybe not. In our head, we said, well, that's not as bad as nuclear. You know, I don't think it's – I guess you can kind of get wrapped around an axle on these kind of arguments. But I think what's important here is that, you know, apart from everything else, what Sound Transit and what FTA did is they did evaluate the safety here. They did evaluate safety concerns. The FTA did look at it. And apart from whether or not they needed to, they did. Well, wait. Okay. We don't want to get wrapped around the axle, but we have to understand your argument. Okay. Sorry. You know, you came in here in your red brief and argued there was no jurisdiction, literally, because NEPA didn't apply at all. Do you still take that position? I believe that that is a sound argument, Your Honor. And I like the argument, but I appreciate there's another way of looking at it. And so, you know, Mr. Alkire has said that there's all this money being spent. I don't know exactly how it's being spent. They are reconfiguring the floor. Let's go to your second. Let's say the first one we disagreed with you on. So then you go to the environmental, the supplemental materials and see. And they definitely mention safety. But do they do anything to document safety other than mentioning it in passing? You know, FTA is in a role of deciding whether to fund this, to provide funding with this project. And they're in a position of, in doing that, NEPA does infuse that process. Is this a good idea?  What they want to know from Sound Transit is what are the safety concerns and are the safety concerns going to be addressed. And they received assurances from Sound Transit that there were developments in the signal system that were going to maintain a separation. The fire department had looked at this thing. The ventilation was fine. Evacuation was fine. That really there wasn't any significant cause for concern. And so the way FTA has to look at this, okay, is there a significant environmental impact resulting from this change in use of this tunnel, this change of operation? The one that's under discussion here is fire life safety issues. And they received assurances that were satisfactory to them that Sound Transit was taking care of those issues. So the answer is no, there's no data that was supplied supporting those assurances? Well, there was certainly. Judge McKeon asked. I'm sorry. I don't understand the assurances. I think her question was where's the backup data and what's that supply? Well, the backup data is in the environmental assessment, and the backup data is in the information supplied by Sound Transit. Well, we have two things going on here. First, you say you gave them the assurances and they were happy. If they were so happy, I don't know why they're here. So what's they're not so happy? You know, I mean, they don't seem to be 100% happy. The second thing is we have the bold statement that safety is considered. Where's the backup as to how that was analyzed? I've cited it in my brief, Your Honor. There's pages in my brief where that discussion takes place. In terms of the underlying data, that's going to be in the administrative record. Well, most of it says it will be designed, it will be coordinated, it will be reviewed, it will be completed. But we have to understand, Your Honor, that this project is at a very much of a planning conceptual phase. The hard-core data, I would submit, is not required for an environmental assessment and certainly is almost never going to be available for a project at this stage of development. Do you want to give your co-counsel a chance? Yes, Your Honor, I would. Thanks. Mr. Moritz. Good morning. Let me address a couple of the issues that came up. I think, first of all, we have to remember the focus here is on what impacts, if any, are a result of a change. So looking at your nuclear power plant issue, the EIS looked fully at changing the bus tunnel to a rail tunnel and the physical changes associated with that. So it's changing the electric power plant to a complete nuclear plant was looked at in the EIS. There's no issue about that. Now the owner of the plant decides, well, we're going to continue to use some, generate something out of electricity. And so Sound Transit looked at that new change in an environmental assessment, which is part of a NEPA process. So it wasn't a disregard of the issue. It was taking an appropriate NEPA step of looking at an environmental assessment. And that environmental assessment was informed by the joint operations report, which was incorporated into the environmental assessment, which was a study that was done by Sound Transit in conjunction with other local affected agencies, including the city, metro, the fire department, to look at this change with joint operations and what that might mean with respect to issues. And what that found is while it would be an operational change, the issues were not such that they create rise to the level of an environmental impact. On the safety issues, what that report found is that a new hybrid signal would be implemented in order to assure separation between trains and buses. That's the main issue that is the safety issue raised is the separation between trains and buses. On that point, do you agree with the appellants that the environmental assessment or at least some assessment needed to be made of the safety issues? Well, I don't know that I agree with that because I think the, I mean, the FTA makes a compelling argument that the particular safety issues that they're looking at are purely connected to the operational issues, not to the physical changes that are going on. And I think there is a compelling argument there. The fact is that Sound Transit did do an environmental assessment responsibly, did respond to the comments of the FTA and the Republic, did issue a revised environmental assessment. So whether or not they could have avoided it, I don't think is a relevant question to this. They did, in fact, do an environmental assessment that informed the conclusion that this change from the original EIS did not have significant impacts. And again, the operational change has to be related to some physical change in the environment in order to trigger NEPA in the first place. And the fact that there's an electronic substation being built has nothing to do with the operational change of having bus and transit. Well, let me give you an example. I mean, the one that we looked at in Ocean Advocates, and that was the question of whether increased tanker volume without necessarily any physical change to the plant was enough to trigger the need for an EIS. And under your theory, that case was wrongly decided, I think. No, I don't think so. Because what happened here, there wasn't a determination that, well, we can just ignore the issue. It was the responsible step taken of doing an environmental assessment. You have a long history here of environmental review, which has been incorporated along each step of the way, which is entirely appropriate for the parties to do, and that has informed the prior two cases in the district court that upheld the adequacy of the 1999 EIS. So there's been a long record of over 10 years of environmental review on this Sound Mood project and its predecessors. You're at this point now where there is a change, which is mostly a very minor change. That is taking what was a 21-mile segment, reducing it to 14 miles, which is exclusively the exact same 14 miles, including the 21 miles, with one exception, that being the joint use of the tunnel. So at that point, it wasn't blowing off of the environmental concerns. It wasn't just a conclusion made. There was a study made. One of the joint operations study was performed, and it was looked at as part of the environmental assessment. So I think that the notion we're arguing is that in the context of an actual study on the impacts of the volume change in the tunnel, that that was a reasonable conclusion, was a hard look as required, and it fell within the agency's standards to say based on that evidence and the 1990 EIS, the operational report and the EA, that there wasn't a significant impact. We're not saying that in every case an increased volume of traffic or tanker traffic or whale boats going after whales would necessarily fall outside of the EIS NEPA process. But in this case where you have a complete adequate EIS that's informed by an EA and an operational report. That's the same argument that was made in those cases because there was an underlying EIS, and they said we only need to do an EA on the increased volume. Well, I don't think they're factual differences. But I don't think we could say that in every case when there's just an operational change that only an EA is required. And I appreciate that. The gist of our argument in our brief was not on that point. That was the gist of the FTA's argument. Our argument was more focused on the actual evaluation that was done of the joint operations. And I think in that point, I see I'm running out of time. I do want to make the point. Brian. What? I'm sorry. I need some more, though. We're already out of time, I guess. I see that's a stop. If I could just make one brief point. When we're talking about this type of operational safety issues, NEPA recognizes that there's a continuum. NEPA's got to be done early in the process. The amount of hazard review that you would do of an operational issue like this early in the process is different than what you do as you get along towards the operational stage. And I think that was recognized in the joint operational report, that as you get forward and closer to operations, there will be increasing ability to fine-tune the safety issues. And I think that's entirely appropriate under NEPA. You can't deal with all the operational issues up front. You need to identify them. Can I just touch briefly on the absence of mitigation? That was the second point. I mean, excuse me, alternatives, is that that wasn't really examined here. And that this is encompassed in the umbrella. Okay. You're talking about the TSM argument? Yes, that was the second point there. Okay. I think there are two things. First of all, I think that they are wrong, that the TSM analysis is not something that needs to be in NEPA. NEPA needs to find a no-action alternative, which was in there. But the TSM analysis is something for the New START program, as there are a lot of issues for the New START program that have to be analyzed, that were in fact analyzed. But that doesn't mean it has to be in the NEPA document. In fact, in addition to that, 1993 EIS that was done did look at a TMS analysis of the very type that they would have argued here. The 1993 EIS was incorporated into the 1999 EIS expressly. So to the extent that the TMS, T-A-T-S-M, sorry, I may be getting my acronyms mixed up, was done in the 1993, that is fairly incorporated into the 1999 EIS. But we don't believe that it is a requirement under NEPA simply because it's a funding one of the elements of the funding that FTA looks at. What's required under NEPA is looking at alternatives, including the no-build, which was in fact done. Roberts. Okay. Thank you for your argument. Counsel? Put three minutes on the clock, please. If the Court pleases, I'd like to do this backwards. I'd like to start with alternatives analysis. And we rest on FTA's NEPA regulation 23 CFR 771.125A1. That regulation states that the final EIS must identify the preferred alternative and evaluate all reasonable alternatives considered. The preferred alternative here, undisputedly, is the project they intend to build. Initial segment. This was not evaluated in any EIS. That's subpart A of our alternatives argument. Subpart B. So let me just understand. If they have an EIS on a four-lane, 50-mile highway and they only build 20 miles of it, they have to have another EIS? Your Honor, if they don't change the project, the answer is not necessarily. Here they change the project. When they went back two years later for new federal funding, they defined a new federal project, initial segment. That's in the record. It's undisputed. Subpart B, if I may, of our alternatives analysis is that the same regulation I just quoted requires evaluation in the EIS of all reasonable alternatives considered, meaning considered by the agency. By definition, they must consider the TSM baseline. It is required that they consider that. The district court said, well, they're considering it for funding purposes. But I'm reading from the NEPA regulation. And the NEPA regulation says in the final EIS you must consider and evaluate that reasonable alternative. If I could turn now to significant effects and allude to the Court's remark that assurances do not equal evaluation. The requirement is for evaluation, not for assurances. Pardon me, but in our opening brief, we quote on page 11 from the Marsh decision of the Supreme Court where it requires that the information based on the evaluation of the significance or lack of significance. Assurance is not evaluation. Assurance is equivalent of a rubber stamp. The law of this circuit is very clear that a rubber stamp is not sufficient. Safety and environmental effects. 40 CFR 1508.27b expressly references in subsection 2 effects on public health or safety in terms of determining whether there is a significant effect. This is not collateral. This is core. If one builds a brand-new interstate highway system and never puts a car or truck on it, it's pretty safe. The issue is whether the operation of that facility implicates safety. The same is true here. They could build a brand-new beautiful thoroughfare, but until they mix the buses and trains, the safety issue doesn't come into play. The FTA funding here is for construction and operation of this facility. Thank you very much, and to repeat, we request a reverse and remand for compliance with NEPA. Thank you. Thank you. Thank both all counsel for their arguments. They're quite helpful.  Court will be in recess for the day. Thank you. I thought we were in San Francisco when you weren't around. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you.
judges: Hawkins, Thomas, McKeown